We move to the fifth case this morning, Laux v. Zatecky. Ms. Shah? Good morning, Your Honors. It may please the Court. Nina Shah on behalf of Petitioner Appellant Frederick Laux. Fred grew up in a family steeped in dysfunction. He had an alcoholic, absentee father with a nasty temper, who was in and out of jail, who exposed his very young children to violent content in X-rated films, and whose addiction depleted his family's meager income. Fred's mother was no refuge. She was an emotionally absent, premorbid schizophrenic who did not interact with her children and did not show them any love, affection, or care. Trial counsel in this case was tasked with representing Fred, who was facing the dark prospect of spending the rest of his life in prison without the possibility of parole. Because Fred was not contesting his guilt, counsel's primary responsibility was to thoroughly investigate and present mitigating evidence that would counteract the picture of Fred being presented by the state and that would help the jury to understand Fred's horrible upbringing and move the jury to show Fred mercy. Counsel completely abandoned that duty. Counsel performed practically no investigation into Fred's background and said nothing about it during trial. He based his mitigation case solely on Fred's lack of criminal history. The state, for its part, repeatedly highlighted Fred's lack of emotion as an indication that he lacked remorse. Having heard only one reason why Fred's life should be spared and having heard virtually nothing to humanize Fred and to refute the state's picture of Fred as a cold-blooded, unrepentant killer, the jury sentenced Fred to the maximum penalty of life imprisonment without parole. It cannot possibly be the case that trial counsel's representation satisfied the Sixth Amendment. The state court, however, found that it did. The state court believed that a difficult childhood categorically is entitled to no mitigating weight. That, of course, is not a proper view of the law, but that is the mistaken lens through which the state court thought about this case and that poisoned and fundamentally undermined the state court's entire analysis. It colored it so much so that the state court discounted Fred's difficult childhood as de minimis. Specifically, when assessing deficiency, the state court improperly deferred to counsel's tactical choice to not introduce evidence of Fred's childhood because it was de minimis without ever assessing whether counsel based that alleged choice on a reasonable investigation. And when determining prejudice, the state court discounted Fred's difficult childhood as de minimis without ever conducting the requisite evaluation of the totality of the available mitigation. So because the state so clearly unreasonably applied Strickland, you know, this court today, we just need to focus on the de novo question of whether there was a constitutional violation here, and there clearly was. I'll begin with prejudice. There is a reasonable probability that had the jury heard Fred's difficult childhood, it would have come to a different sentencing decision. The jury would have heard a very classic picture that anyone would shudder at. They would have heard that Fred had a family history of schizophrenia, a disease in which people have difficulty showing emotion and forming relationships. They would have heard that emotion was not modeled or shown in Fred's family, and that to this day, Fred's sister recalls experiencing frozen tears, where she was unable to express herself because she had been so used to being hurt. They would have heard that Fred's father was an out-of-control alcoholic, that he was in and out of jail, that he took his young children, who were still developing, to view X-rated content, that he would get in such explosive fights with his children's mother when he was drunk that his children would overhear it, and they would wait to see if it would get violent. That when his father was going through alcohol withdrawals, the kids would basically tiptoe around him, trying to avoid a blowup. They would hear that Fred's father was naked at all times, regardless of who was around, whether his children, his children's friends, or his children's significant others. The jury would understand that with an absentee father like that, it made Fred's mother all that much more of an important figure, but they would have learned that she was no better. She was a premorbid schizophrenic, and she didn't interact with her children. She basically just sat in a chair all day. She didn't show them love, affection, or encouragement, and she was always paranoid and quote-unquote off. So the jury would have heard that Fred was left with no one. This is the kind of troubled upbringing that this court and the Supreme Court have repeatedly recognized is pertinent to a jury's appraisal of moral culpability. Ms. Shah, in other cases, we or the Supreme Court have used terms like nightmarish or horrendous to describe the upbringings of people who were complete messes as adults. In this case, if I understand this correctly, Petitioner Lowe was a reasonably successful adult holding responsible jobs, raising a family, and it wasn't until at about age 35 or 36, he could not cope, obviously, with the divorce from his wife Heidi, but for the last 15 years, maybe longer, including his successful record in college, he's a successful human being. Why is it unreasonable to think that that long period of success as an adult would, in essence, attenuate this kind of argument based on difficulties in childhood? So as for the unreasonability question, the State Court was unreasonable because it failed to evaluate all of the evidence. It just evaluated the fact that he had done well in school and at work, and the fact that he had stayed out of trouble. It didn't evaluate everything else, and anyone who had heard the entirety of the mitigation would understand that anyone that has been exposed to the behaviors that Fred has been exposed to, that is scarring, and it will leave a long-term impact on anyone. The fact that he did well in school and stayed out of trouble, that is not inconsistent. His counsel did call mental health professionals, didn't they? Yes, Your Honor. And what did they testify to? Right. So they just testified to, so they were commissioned solely to determine competency and sanity, and so they really just testified to their mental health findings. They were the ones that determined whether or not he was able to stand trial. Correct. Oh, yeah, it was limited only to determining whether he was competent to stand trial and whether he was sane at the time of the offense, but you know, a jury wouldn't need a mental health expert to... But one of them testified that he had moderately severe depression, and the other diagnosed him with antisocial personality disorder. Is that right? Correct. So the jury did hear some of the, at least... Right, so antisocial personality disorder is actually a very harmful label. It indicates that the defendant lacks remorse and has no empathy towards others and has an emotional disregard for others. So that actually emphasizes how important it was for the jury to hear an additional and potentially alternative explanation for why he appeared to lack remorse at trial and why he lost control over his emotions. Do we know if those professionals heard his background, his upbringing? They did hear from, based on the competency and sanity reports, they heard a basic sketch. They heard that his father was an alcoholic, his mother was a paranoid schizophrenic, he didn't have a close relationship with either of them, but that was about it. And you know, so they didn't have the full picture, and they also, I mean, we have to keep in mind what they were commissioned to do. They had a very narrow task. Determining competency to stand trial is basically... Well, they did initially, but then they were called back in the sentencing phase, right? They were called by the state. They were the state's witnesses, but the questioning was basically just limited on questions of mental health. But to go back to Your Honor's question about, you know, how does this case fit in line with the other cases where the court has described it as a nightmarish childhood? You know, any case, and particularly for a fact-dependent standard like Strickland, will rest on different circumstances. But Fred's case absolutely falls within the category of cases where the court has found prejudice. It falls in line with cases like Griffin, for example, where prejudice was found where the defendant's father was an alcoholic and the mother was absent from the home. It falls into line with cases like Brewer, where the defendant's father showed minimal interest in the defendant's development, and, you know, the parents were alcoholics in there as well. And it falls into line with cases like Rompilla, where the parents showed no love, affection, or expression, and the parents were alcoholics. So there are pertinent... And that is designed, in your view, to excuse, or at least to mitigate the fact that in the middle of the night, he went and killed his wife with a crowbar, right? Well, it's not to excuse it, but it's certainly... No, I didn't say excuse it, but to explain. Right. Well, absolutely, and that's the point of mitigation. The point of mitigation is to provide the jury with a broader context for why he may have done what he did, or just to make the jury feel bad for him, to feel some sympathy for him and see him as a human. So the fact that his father was an alcoholic that helped explain why he went and killed his wife? Well, it's the full picture, Your Honor. It's absolutely... The fact that his father was an alcoholic, he was exposed as a young, young boy to violent content... I guess one of my points is he himself was not abused in this upbringing, right? He was not physically abused, but the Supreme Court has never required that there be physical abuse or any signs of abuse. It has never required anything specific. It has recognized this as a fact-by-fact, case-by-case analysis, and this Court can look at that de novo because the State Court's determination was completely unreasonable. It thought that childhood evidence was categorically diminished. Wait a second. We review it de novo? Well, after we clearly established that the State Court opinion was an unreasonable application of Strickland, which I think we have, but I'm happy to provide more. I understand you assert that. Yes, yes. Okay, I see my time is up. If there are no further questions... Thank you very much, Counsel.  Mr. Martin? May it please the Court, James B. Martin for the Respondent. This Court should affirm the District Court's denial of habeas relief because the Indiana Court of Appeals reasonably applied clearly established federal law to Mr. Lowe's claim of ineffective assistance of counsel. When we talk about these claims of inadequate investigation, in many instances, and this is certainly one of them, the easiest way to dispose of the claim is to look to the prejudice prong. And in this case, approximately nine years after trial counsel's representation and the jury's verdict, we have evidence that was presented in a post-conviction hearing. From the petitioner's sister. And I just have to take some issue with the characterization of that evidence. You know, first of all, the sister made statements during her testimony to the effect of like she didn't remember a good deal of her childhood. The fact of the matter is, through the sister's testimony, that Mr. Lowe did not even live with his parents during high school but lived with his grandmother in Portage where while in high school he played football and wrestled and excelled in academics. There was no violence. The sister to petitioner testified that she and her other sisters and petitioner would wait when he'd come home when he'd been out drinking because he was an alcoholic. And there would be arguments between the mother and the father and they'd wait to see if it got violent. And she expressly testified it never did. There's no evidence in this record at all of any kind of actual abuse. The petitioner's claim and his sister's testimony boiled down to this contention that it was just a emotionally bereft environment to grow up in. And as the court noted, all these years after petitioner had left that home, and it's also important to note, the mother was diagnosed with schizophrenia when petitioner was 26 years old and already a married man. To the extent that there was any premorbidity in the home, that's somewhat speculative even on the expert's part. And there's no evidence that to the extent she was premorbid that there was any abusive behavior or deprivations of any of the essentials of living because of any premorbid condition. And in fact, the record shows that the mother had a part-time job while the sister was in high school working at a cannery. So it's not as if she was unfunctional and unable to interact with people. I also want to point out the movies that are alluded to by the sister's testimony. One of them was Animal House. I don't know if showing an elementary school-aged child Animal House is stellar parenting, but it's certainly not abusive in any way. With respect to the X-rated movies, she said that one time her father took her to a drive-in that showed X-rated movies, and she couldn't remember who was present when that happened. So she didn't even know if petitioner was there. She didn't remember anything about the movie. I mean, this is just not quality testimony, even for the purposes that petitioner suggested it should have been offered at trial. And so in these kinds of situations, the quality of the evidence is tied to counsel's effectiveness or ineffectiveness in investigating and ferreting out this kind of information. So I want to go back to trial counsel's testimony at the post-conviction hearing. He stated, and so often is the case in cases like this, the trial attorneys, so many years after the fact, they do not remember every aspect of the prior representation. And in many instances, and this would be one of them, there was much that trial counsel did not remember. He testified that he did believe that he spoke to family members. And he also recollected that there was a sister, but he couldn't remember any conversations that he had. Interestingly, the record discloses that petitioner has three sisters that he was close with, and they're all close in age. I think they follow one year after the other, all the siblings. And only Ms. Knoth testified at the post-conviction hearing. So she testified that counsel did not speak with her, but we don't know what counsel did, what conversations he had with other family members. He believes he spoke with them. Counsel is presumed to render reasonable representation, absent any compelling evidence to the contrary. So here, what counsel did was he took the expert's testimony, and the fact that one of the experts, the one that diagnosed antisocial personality disorder, found that he was operating under a delusional belief system that was based on his intense Catholic faith. And that was that without an annulment, if she was going to get involved with another man that became sexual, she would be categorically an adulterer, and his children would be living under the roof of an adulterer. So that was, by his account, a motivating force behind the crime. So counsel presented a Catholic priest who was familiar with petitioner, and another parishioner who was friends in the parish with the petitioner, and they talked about his Catholic faith, and then counsel appealed to the jury to find that under this delusional belief system and the mental disease that Dr. Parker testified that he suffered under, that he just snapped when he woke up at 3 o'clock in the morning and essentially put on what I would characterize as his murder suit. That was a much more cogent and persuasive and focused presentation to give to the jury than to just throw out any tidbits of childhood that would, in most people's, well maybe I shouldn't say most people, but in many people's experiences, is not particularly uncommon. Many of us have family members and people that we know that struggle with mental illness. Alcoholism is certainly not an uncommon incidence in family life, and without any evidence of any serious privations or abuse in this record, counsel was certainly reasonable in declining to detract from the main focus of his penalty-based presentation. At a somewhat higher level of generality, Mr. Martin, could you address the Indiana Court of Appeals' comment to the effect that in Ritchie, our Supreme Court, the state Supreme Court, noted that it has consistently held that evidence of a difficult childhood warrants little, if any, mitigating weight, and yet we've got this long series of U.S. Supreme Court decisions, particularly in capital cases but not limited to that, treating difficult childhood evidence as having very significant mitigating value. Oh, and I appreciate that inquiry, Your Honor, and certainly. The evidence, whether it is significantly mitigating, whether it fits into a reasonable and competent penalty-based presentation, depends on the facts and circumstances of each case. And so there's no Indiana law, Your Honor, that categorically excludes as having mitigating weight background evidence. It is the character and weight of that evidence as it weighs against the aggravating circumstance. And so there are numerous Indiana holdings that discuss how in previous cases they have found that developmental evidence was not significantly mitigating. The court in this case, when it discusses that, is discussing this specific evidence and very reasonably determining that it was de minimis. I think when you, and I think Your Honor has alluded to this somewhat when Ms. Shaw was speaking, Wiggins, Rompilla, Wilson, those are horrific backgrounds if the evidence is credited by the sentencing decision-maker. I think in the Wiggins case, the children were forced to eat paint chips because they were going hungry. They were sexually abused. The problem I have here, Your Honor, we are supposed to decide whether the court of appeals was reasonable. And the court of appeals looks at this case and says the defendant didn't have, he had, it was a difficult childhood, but that's about it. He wasn't really the victim of abuse and neglect. It's awfully categorical. Is that reasonable? They didn't spend much time discussing the evidence. I agree, Your Honor. Why didn't they do that? But I don't think that it was a categorical finding. I think that you have to look at the case and decide whether it's reasonable in all the facts and circumstances and consistent with Strickland's requirement. The Strickland question is what matters. Was this individual prejudiced or was he not? Did they reach that question? Is that considered, was that on the prejudice prong that they said that or did they say that on the question of the standard of counsel care? Your Honor, I don't recall what the exact sequence of the court's comments were. But I found that to be a comment on prejudice, which also speaks to counsel's obligation to have found this kind of evidence. But it certainly was not a categorical finding that that evidence couldn't be mitigating just because of the kind of evidence that it was. Clearly, if Mr. Lowe had presented evidence of a very difficult upbringing, that would have had some mitigating value. But if it hadn't outweighed the evidence of the B-1 aggravator, which is the felony murder, which is the entire... I'm sorry, Your Honor, I am out of time. No, go right ahead. The entire focus of a B-1 aggravator under Indiana law is intentionality. And so the evidence of Mr. Lowe's cool, calm, reflective, premeditated entry into his ex-wife's home... But perhaps delusional. Yes. You can be cool, calm, and collected and very delusional. Oh, and that was trial counsel's play before the jury, Your Honor. On the basis of what testimony? On the basis of Dr. Atkins' testimony and her reports. So your view have a very different view of Dr. Atkinson's testimony than counsel's for the... Absolutely, and in one respect, Your Honor, there was just a lot more detail in Dr. Atkinson's testimony about background. Really, this oral argument is coming down to a disagreement between the two of you on the value of that testimony, isn't it? Yes, and also, I think from Petitioner's perspective, there's a complete lack of recognition of the quality of this crime and the quality of the reflected, premeditated nature of it. This individual grabbed condoms before he left because he thought he might want to rape his wife before he killed her. It was very matter-of-fact about his purpose when he woke up and put that suit on was to kill his wife. He said he was going to fix her, which he explained to people that didn't necessarily understand what that meant, that he was going to go kill her. I mean, it's a very heinous crime. It shows a very calm, cool, reflective commitment to take this woman's life, and he did it in brutal fashion. And so when you look at prejudice, naturally, the quality of the mitigation evidence is going to have to be strong to overcome that evidence of intentionality and the evidence of that crime, and it wasn't. And so it was not prejudicial under Strickland for counsel not to have presented it, and counsel instead opted for a cogent and focused penalty phase presentation. Thank you, counsel. Thank you, Your Honor. You don't have any time left, but I'll give you a minute. Thank you. So opposing counsel has discussed the fact that there was no abuse and there was no specific indicators that are as bad, for example, as Wiggins. Could we imagine situations that are worse than Fred's? Sure. You know, it's easy to talk in high levels of generalities just because we know of cases where people have been subjected to things that are far worse, but we don't need to prove that Fred's case is the worst childhood evidence we've ever seen. We don't need to prove it's identical to the facts in Wiggins. All that needs to happen is there needs to be a case-by-case evaluation of the totality of the available mitigation to determine if the jury would have been swayed by it. There's a better than negligible chance that a jury would have been swayed by this evidence, and there unquestionably is. Even though Fred did well later on in his life, anyone would understand that somebody exposed to the kinds of traumatic and toxic behaviors that Fred was is going to be scarred and that's majorly consequential to his development. And the fact that we know of people that have gone through similar things goes to show us that we do show them empathy. We do show them sympathy. Second of all, with respect to his point about the point that this was a terrible crime, we certainly do not contest how terrible this crime was. That's not what this case is about. We're not asking this court to sit as the sentencer. This case is about whether the Indiana Court of Appeals unreasonably applied Strickland, which it clearly did, and then beyond that to determine whether there is a better than negligible chance that had the jury heard this substantial and compelling information that fills in the blanks in their understanding of Fred, they would have been swayed. They would have been swayed, and they would have made a different decision. Thank you, counsel. Thank you. Thanks to both counsel, and the case will be taken under advisement.